# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION**                                                          **PLAINTIFF**

**v.**                          **Case No. 4:22-cv-00820-KGB**

**BRINKER INTERNATIONAL PAYROLL
COMPANY, L.P.,** *et al.*                                              **DEFENDANTS**

## OPINION AND ORDER

Plaintiff Equal Employment Opportunity Commission ("the Commission") brought this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), asserting that defendants Brinker International Payroll Company, L.P. ("BIPC"), Brinker International, Inc. ("BI"), and Brinker Arkansas, Inc. ("BA") d/b/a Chili's Grill & Bar ("Chili's") (collectively "Defendants") subjected "Charging Party," a female, and a class of three other females[1] to unlawful harassment and a hostile work environment based on sex and constructively discharged the Charging Party (Dkt. No. 1, at 1). Before the Court is Defendants' motion for summary judgment (Dkt. No. 51). The Commission filed a response in opposition to Defendants' motion for summary judgment (Dkt. No. 59), and Defendants filed a reply in support of their motion (Dkt. No. 70). For the following reasons, the Court grants Defendants' motion for summary judgment (Dkt. No. 51).

---

[1] The "Charging Party" and members of the class have now been identified and will be referred to throughout this Order by name. The "Charging Party" is Emily Page (formerly Emily Keaton). The other class members are Miranda Bentz, Chloe Holdcraft, and Evening Sharp (collectively "Class Members") (Dkt. No. 52, at 3).

## I.    Statement Of Facts

In compliance with Rule 56.1 of the *Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas*, Defendants filed a statement of undisputed material facts along with their motion for summary judgment (Dkt. No. 51-2).  The Commission responded to Defendants' statement of undisputed material facts (Dkt. No. 60).  The following facts are taken from the parties' filings as noted herein.  The Court has not included in in its statement of fact opinions, argument, legal conclusions, and immaterial facts from either parties' filings.

### A.    Defendants

BIPC is a limited partnership that employs the individuals who work at Chili's (Dkt. Nos. 51-2, ¶ 1; 60, ¶ 1).[2]  BA is a corporation that serves only to own or lease the land in Arkansas on which Chili's restaurants are located (Dkt. No. 60, ¶ 2).  Dan Fuller has worked for BIPC for approximately ten years and has served as Senior Vice President, Chief Legal Officer, and Secretary at BI for approximately six years.  Fuller is also Vice President and Assistant Secretary at BA (*Id.*).  Fuller, through BIPC Management, LLC, effectively controls BIPC (Dkt. No. 60-1, at 15).

### B.    BIPC Policies

Defendants adopted anti-harassment and EEO policies (Dkt. Nos. 51-2, ¶ 5; 60, ¶ 5).  BIPC's written policies strictly prohibit discrimination and harassment on any basis protected by

---

[2]   The Commission disputes the statement of fact and asserts that Defendants are "joint employers" of the Class Members (Dkt. No. 60, ¶ 1).  The Commission does not support this assertion with a citation to any relevant, admissible evidence in the record before the Court as required by Federal Rule of Civil Procedure 56(c).  Accordingly, the Court will consider the statement of fact admitted for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

federal, state, or local law, including sex (Dkt. Nos 51-2, ¶ 6; 60, ¶ 6). BIPC's written policies instruct employees (generally referred to as "team members") who believe they have witnessed or been subjected to discrimination or harassment to report incidents to BIPC, and BIPC's written policies provide team members with multiple reporting options, including via a Manager, General Manager/Managing Partner, Director of Operations (formerly "Area Director"), Director of PeopleWorks ("PeopleWorks" is what most other companies refer to as "Human Resources"), PeopleWorks Partner, Director of Employee Relations, Employee Relations Hotline, or Team Member Relations ("TMR") (Dkt. No. 60, ¶ 7).

Chili's asserts that it posts contact information team members can use to report incidents in various locations throughout the restaurant, including outside the manager office door, and on boards at the front of house and in the To-Go area (Dkt. No. 51-2, ¶ 8). The Commission disputes this fact stating that the Class Members testified that they never observed such postings and were unaware of any reporting contact information being made available to them (Dkt. No. 60, ¶ 8).

According to its written policies, upon receipt of a complaint, BIPC will promptly initiate an objective, thorough, and, to the extent possible, confidential investigation and take appropriate remedial action when necessary, including action that is reasonably calculated to deter any future discrimination or harassment, up to and including termination (Dkt. No. 51-2, ¶ 9). Additionally, under the written policies team members are expected to cooperate fully in any investigation (*Id*., ¶ 10). BIPC's written policies provide that BIPC will not tolerate or permit retaliation by management, fellow team members, guests, or vendors for reporting or participating in the investigation of a complaint of discrimination or harassment (*Id*., ¶ 11).

Each new team member is asked to acknowledge, via signature, that they read, understood, and agreed to follow BIPC policies, procedures, and practices (*Id*., ¶ 12).[3] Each new team member also agrees to ask for an explanation from their manager or PeopleWorks if the policies contain anything they do not understand (*Id*., ¶ 13).[4]

At their hires, the Class Members, as well as D.J. Thompson, all acknowledged they received, read, understood, and agreed to follow BIPC's policies, including those related to EEO, anti-harassment, and reporting procedures; they also agreed to contact their managers or PeopleWorks for any explanations regarding the policies (*Id*., ¶ 14).[5] At all relevant times, the Class Members and D.J. Thompson were all aware of, had access to, and understood BIPC's policies prohibiting and procedures for reporting harassment (*Id*., ¶ 15).

Defendants assert that at no point during the relevant timeframe did any of the Class Members seek explanations from their managers, PeopleWorks, or anyone else regarding those policies and procedures or inform anyone that they did not review or understand the policies and

---

[3] The Commission disputes this statement of fact but does not support it with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c). Accordingly, the Court will consider the statement of fact admitted for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

[4] The Commission disputes this statement of fact but does not support it with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c). Accordingly, the Court will consider the statement of fact admitted for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

[5] The Commission disputes this statement of fact but does not support it with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c). Accordingly, the Court will consider the statement of fact admitted for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

procedures (*Id.*, ¶ 16).  The Commission contends that, during orientation, Defendants told Bentz to sign the acknowledgment form without reviewing the policies (Dkt. No. 60, ¶ 16).  Former Assistant Manager and current General Manager Kyle Leonard testified that he would verify that a new hire signed the acknowledgement form, and "[w]e don't actually verify if they've gone through and read each one of the policies." (*Id.*).  Managing Partner Robert Brown ensures that new employees have read all of the policies and procedures by their signature saying they did (*Id.*).

### C.    Class Members' Report Inappropriate Conduct

The Class Members and D.J. Thompson worked together at a Chili's restaurant located in Benton, Arkansas (Dkt. Nos. 51-2, ¶ 17; 60, ¶ 17).  BIPC hired D.J. Thompson as a cook on or around December 21, 2020; Holdcraft, Bentz, and Page as hosts on or around October 22, December 29, and December 29, 2020, respectively; and Sharp as a server on or around January 19, 2021 (Dkt. No. 60, ¶ 18).  BIPC hired Page on December 29, 2020, as a host, but she also worked in the "To–Go" area where she coordinated to–go orders, retrieved food, and provided food to customers (*Id.*).  BIPC hired Holdcraft as a host on October 22, 2020, but she also worked in To–Go, Quality Assurance, as a food runner, and as a server (*Id.*).  When BIPC hired D.J. Thompson, he was 32 years old, Bentz was 17, and Page, Holdcraft, and Sharp were 16 (*Id.*, ¶ 19).

Neither the Class Members nor D.J. Thompson were managers during their employment with BIPC (*Id.*, ¶ 20).  The Class Members and D.J. Thompson all reported to Brown and to Assistant Managers Jacob Hefner and Leonard (Dkt. Nos. 51-2, ¶ 21; 60, ¶ 21).  Alyssa Downie was a Certified Shift Lead, who was responsible to report an employee's complaint of sexual harassment to PeopleWorks and her management team (Dkt. No. 60, ¶ 21).  Downie was responsible for relaying complaints to management (*Id.*).  If someone had a problem, they could go to Brown, Leonard, and Hefner and discuss it (*Id.*).  They could also go to Downie, with

limitations (*Id.*).  Downie could receive complaints of sexual harassment, and her expectation would be to relay messages to the management team (*Id.*).  Some Class Members testified they believed Downie was an assistant manager (*Id.*).

On April 16, 2021, late in the evening near closing time, Downie noticed Holdcraft seemed upset (*Id.*, ¶ 22).  Downie approached Holdcraft to determine the cause and learned that Holdcraft and another BIPC team member, Cameron "Isaiah" Thompson (unrelated to D.J. Thompson), had been arguing (*Id.*, ¶ 23).  Holdcraft told Downie that Isaiah Thompson had criticized Page, who was not present at the restaurant, for speaking with D.J. Thompson and was joking about the situation (*Id.*, ¶ 24).  This made Holdcraft cry (*Id.*).  Downie was able to elicit information from Holdcraft suggesting potentially inappropriate interactions involving D.J. Thompson (Dkt. Nos. 51-2, ¶ 25; 60, ¶ 25).  Holdcraft reported D.J. Thompson made sexual comments to her and Page, such as:  "Oh, you're hot.  I mean just small things that a 30-year-old shouldn't say to a 16-year-old." (*Id.*).  Holdcraft said D.J. Thompson made comments about their butts, figures, and how they look and would tell her, "Oh you're hot" like just "being a pig looking at some child like a piece of meat." (*Id.*).  Holdcraft stated, "You couldn't even walk past [D.J. Thompson] without him looking at you or looking at your butt or if he could walk past you, he couldn't help it but kind of just ride his hand over you." (*Id.*).  Holdcraft also reported that D.J. Thompson tried to grab her butt (*Id.*).  This was the first time Holdcraft told management anything about the alleged harassment (*Id.*).

Prior to this time, no one, including the Class Members, had come forward to report any inappropriate conduct, let alone harassment, by D.J. Thompson (Dkt. No. 51-2, ¶ 26).  The Commission contends that the harassment by D.J. Thompson was known to other employees regardless of the absence of a formal complaint (Dkt. No. 60, ¶ 26).  Sharp heard two comments.

First, around February 2021, a line cook yelled out "come on DJ don't go flirting with the minors" (*Id*.). The second comment was from a bartender in front of Sharp and Downie that D.J. Thompson needed to stop flirting with "little girls." (*Id*.). Sharp testified that D.J. Thompson looked and looked at every girl; he was flirty and joked around (*Id*.). Holdcraft testified "it was kind of common knowledge to everybody that [D.J. Thompson] was kind of a creep." (*Id*.).

### D.    BIPC's Response To The Reported Conduct

Though it was after hours, on April 16, 2021, Downie promptly contacted Brown about the report from Holdcraft to escalate the matter to management (Dkt. Nos. 51-2, ¶ 27; 60, ¶ 27). Brown was home and not at the restaurant at the time (*Id*.). The next day, on April 17, 2021, D.J. Thompson worked with Page, and the two worked together again on April 18, 2021, for about 30 minutes until D.J. Thompson was sent home (Dkt. No. 60, ¶¶ 5, 27).

On April 18, 2021, Brown and Hefner spoke with Page and Bentz, at which time Page, for the first time, alleged that D.J. Thompson followed her into the restaurant's walk-in cooler and tried to touch and kiss her (Dkt. Nos. 51-2, ¶ 28; 60, ¶ 28). Bentz also alleged sexual harassment by D.J. Thompson to Brown at that meeting (Dkt. No. 60, ¶ 28).

Brown called Brandon Sanders, PeopleWorks Generalist, to report Page's allegations and to request guidance on proper handling of the situation (Dkt. Nos. 51-2, ¶ 29; 60, ¶ 29). Sanders advised Brown to alert TMR of Page's allegations, which Brown did (Dkt. No. 60, ¶ 30). Brown sent an email to TMR on April 20, 2021 (*Id*., ¶¶ 28, 29).

On April 18, 2021, Brown and Hefner informed D.J. Thompson that a complaint had been made against him, and, as a result, Brown and Heffner sent D.J. Thompson home after 30 minutes and prohibited him from returning to work until he was instructed to do so (Dkt. No. 51-2, ¶¶ 5, 31). On April 18, 2021, when confronted with the allegations by Brown and Hefner, D.J.

Thompson denied any wrongdoing and claimed that Page had touched his buttocks, but D.J. Thompson complied with Brown's instructions to leave (Dkt. Nos. 51-2, ¶ 32; 60, ¶ 32). Page denies ever touching D.J. Thompson as alleged (Dkt. No. 60, ¶ 32). Though he was already on the schedule for April 19, 2021, D.J. Thompson was not permitted to, and did not, return to the restaurant to work his April 19, 2021, shift (Dkt. No. 60, ¶ 33). Brown followed up with Page, Bentz, and later Holdcraft to let them know he had sent D.J. Thompson home and was going to escalate formally the matter to corporate for investigation, during which time he would try to separate them from D.J. Thompson by assigning them to work opposite shifts (*Id*., ¶ 34). D.J. Thompson returned to work on April 20, 2021 (*Id*., ¶ 31).

On April 20, 2021, at 9:18 a.m., Brown sent an email to TMR to initiate a formal investigation into the allegations against D.J. Thompson (Dkt. No. 51-2, ¶ 35). Brown's email omitted allegations from Bentz (Dkt. No. 60, ¶ 35). On April 20, 2021, Brown communicated the plan to separate D.J. Thompson from Page, Bentz, and Holdcraft pending TMR's investigation to Hefner, Leonard, and Downie (Dkt. Nos. 51-2, ¶ 36; 60, ¶ 36).

Though schedules had already been set and posted, the leadership team worked to try to adjust them as much as possible in accordance with the plan (Dkt. No. 51-2, ¶ 37). Despite the management's attempts to separate D.J. Thompson from Page, Bentz, and Holdcraft, they continued to be scheduled[6] to work some shifts with each other. For example, on April 21, 2021, Bentz worked a full shift (four hours and 32 minutes) with D.J. Thompson because she had already

---

[6] The evidence pointed to by the Commission to support this assertion is timesheets, not schedules. On the record evidence before the Court, the Court cannot determine whether management scheduled D.J. Thompson to work with Page, Bentz, and Holdcraft. There is evidence in the record before the Court that Page, Bentz, and Holdcraft subsequently picked up and worked some extra shifts overlapping with D.J. Thompson's shifts, but none of them raised any concerns with management at the time about doing so, nor did they allege to management at the time any further inappropriate conduct by D.J. Thompson (Dkt. No. 51-2, ¶ 42).

agreed to pick up the shift for Holdcraft before she reported her harassment to management (Dkt. No. 60, ¶¶ 31, 37). Bentz reported that when she asked Brown if she could not work, he said it is her responsibility to find someone to pick up the shift, and if she could not work it, then she had to come in (Dkt. No. 60, ¶ 37). Bentz states that she told Brown that she did not want to work because she was scared (*Id.*). Bentz reports working the shift caused her distress and prompted her to request a leave of absence (*Id.*, ¶ 31). Bentz worked with D.J. Thompson two additional times prior to his termination on May 5, 2021, on May 1 and 4, 2021 (*Id.*, ¶¶ 5, 37).

Page, who expressed to Brown in a text that she did not mind picking up shifts when D.J. Thompson was there (Dkt. No. 60-25), worked with D.J. Thompson on April 24, 26, 27, and 28 (Dkt. No. 60, ¶¶ 5, 37). Holdcraft worked with D.J. Thompson on April 23, 25, and May 2, 2021 (*Id.*).

Page and Holdcraft did not express any dissatisfaction with or concerns about D.J. Thompson's continued employment pending TMR's investigation (Dkt. No. 51-2, ¶ 39). In a text to *Page*, Bentz stated that she told Brown that she did not think it was fair that D.J. Thompson still got to work there while she and Page did (Dkt. No. 60, ¶ 39), but in a text to *Brown*, Bentz stated, "I don't want you to fire dj because that's unfair." (Dkt. No. 51-2, ¶ 40). At her deposition, Bentz explained the text to Brown by saying that she would have preferred if D.J. Thompson had been placed on leave pending an investigation (Dkt. No. 60, ¶ 40).

On April 25, 2021, after she tried to pick up a shift that overlapped with D.J. Thompson's shift, Page sent a text to Brown stating, "i requested pick up for brandon's shift for tmrw night and I don't care if dj's there, just in case that was the reason for the delay." (*Id.*, ¶ 41). At her deposition, Page explained this text stating that D.J. Thompson had already been scheduled with her several times, and she believed any further objections would not result in change (*Id.*). Page,

Bentz, and Holdcraft subsequently picked up and worked some extra shifts knowing that they would overlap with D.J. Thompson's shifts, but none of them raised any concerns with management at the time about doing so, nor did they allege to management at the time any further inappropriate conduct by D.J. Thompson (Dkt. No. 51-2, ¶ 42). Page, Bentz, and Holdcraft maintain that they could not see when D.J. Thompson was scheduled to work and did not know when they were picking up shifts when they worked with D.J. Thompson (Dkt. No. 60, ¶ 42).

D.J. Thompson stopped physically touching and speaking to the Class Members in a sexual manner immediately after Holdcraft had her late evening discussion with Downie on April 16, 2021 (Dkt. Nos. 51-2, ¶¶ 43; 60, ¶ 43). Holdcraft attributed this to D.J. Thompson being "scared of the repercussions because he knew management knew." (*Id*.).

Page confirmed that D.J. Thompson stopped physically touching and speaking to her in a sexual manner immediately after she complained to Brown and Hefner on April 18, 2021 (Dkt. Nos. 51-2, ¶ 44; 60, ¶ 44). Page told police investigators that "nothing has happened with [D.J. Thompson] since she told her managers at Chili's," "the managers changed her schedule around so that she didn't have to work with [D.J. Thompson] as much as possible," and D.J. Thompson "never talked to her after she told her managers." (Dkt. No. 51-2, ¶ 45).

Bentz confirmed D.J. Thompson did not speak to, touch, follow, do anything inappropriate toward, or otherwise harass her after BIPC became aware of the allegations against D.J. Thompson (*Id*., ¶ 46). Bentz avoided interacting with D.J. Thompson by taking a leave of absence for a period of time and not completing her duties in areas where he was present (Dkt. No. 60, ¶ 46).

### E.    The TMR Investigation

On April 20, 2021, the day it received Brown's email, TMR initiated its investigation into the allegations against D.J. Thompson, assigning the matter to TMR Specialist Brian James "BJ"

Marshall (*Id.*, ¶ 47).  That day, Marshall reached out to Holdcraft and Page via text message and telephone call (*Id.*, ¶ 48).  Neither Page nor Holdcraft responded to Marshall's text messages, and Holdcraft answered Marshall's call but ended the call as soon as Marshall introduced himself (*Id.*, ¶ 49).  Holdcraft stated that she ended the call because she was in school and accidentally answered the call while in class (*Id.*).  Page did not answer Marshall's call, so he left her a voicemail (Dkt. No. 51-2, ¶ 50).[7]  Page did not respond to the voicemail left by Marshall because her phone had been confiscated by her mother (Dkt. No. 60, ¶ 49).

Page avoided Marshall and sent a message to Bentz stating, "I'm not telling the investigators anything" (Dkt. Nos. 50-2, ¶ 51; 60, ¶ 51).  On May 4, 2021, when Marshall reached out to Page at Chili's, she spoke to Marshall for 30 minutes and alleged that D.J. Thompson had sexually harassed her (Dkt. No. 60, ¶ 51).  Page later claimed that she feared losing her job, but she admitted that no one discouraged her from speaking up or did anything to make her think that she would lose her job, which she admitted she did not (Dkt. No. 51-2, ¶ 52).  Page contends that she was scared because she was 16 and because this was her first job (Dkt. No. 60, ¶ 52).  Page states that she was scared, embarrassed, and afraid of D.J. Thompson, who she claims stated that he would follow her home.  Also, Page was told she needed to provide two weeks' notice or she would not receive a good recommendation and that she was expected to cover her shifts or face consequences (*Id.*).

---

[7]  The Commission disputes this fact based on a citation to Marshall's deposition testimony (Dkt. No. 60, ¶ 50).  The citation to Marshall's deposition testimony does not contradict that Marshall left Page a voicemail but does confirm that Marshall did not record leaving a voicemail in his notes (*Id.*, ¶ 50).  Accordingly, the Court will consider Defendants' statement of fact admitted for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

Marshall then attempted to contact D.J. Thompson, but D.J. Thompson's telephone was disconnected (*Id.*, ¶ 53).[8]  Marshall was able to contact Michael Gray, another team member, who told him that Page and Holdcraft would "mess with DJ [Thompson] and he will tell them to leave him alone and get out of his face," and make inappropriate comments about D.J. Thompson's genitals as well as try to hug and get close to Gray, which made him uncomfortable (*Id.*, ¶ 54). Holdcraft and Page deny making these comments (Dkt. No. 60, ¶ 54).

Marshall spoke with Page and Holdcraft at Chili's on May 4, 2021 (Dkt. Nos. 51-2, ¶ 55; 60, ¶ 55).  Page spoke with Marshall for about 30 minutes and provided Marshall details of D.J. Thompson's alleged conduct, including information about an alleged incident in which D.J. Thompson had forced her to place her hand on his penis (Dkt. Nos. 51-2, ¶ 56; 60, ¶ 56).  Page also informed Marshall that D.J. Thompson had sent her an explicit photograph and asked for photographs from her (Dkt. No. 60, ¶ 57).  To confirm her allegations, Marshall asked Page to provide him the explicit photograph she claimed D.J. Thompson sent her, which she agreed to do (*Id.*, ¶ 58).

Holdcraft told Marshall that D.J. Thompson followed her into the walk-in freezer, but otherwise Holdcraft denied that D.J. Thompson sexually harassed her, explaining that her concerns about D.J. Thompson were on behalf of Page (Dkt. No. 51-2, ¶ 59).[9]  Holdcraft confirmed to

---

[8]  Defendants' statement of fact is supported by relevant, admissible testimony in the record before the Court, and the Commission does not support its dispute of this statement of fact with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c).  Accordingly, the Court will consider Defendants' statement of fact admitted for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

[9]  Defendants' statement of fact is supported by relevant, admissible testimony in the record before the Court, and the Commission does not support its dispute of this statement of fact with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c).  Holdcraft signed an acknowledgment form indicating that

Marshall that, since she and Page brought their concerns to BIPC, D.J. Thompson had left them alone (Dkt. No. 51-2, ¶ 60).[10]  Holdcraft further stated to Marshall that Page had recently put in her two-week notice of resignation for "other reasons outside of work," referring to Page's parents making her resign, which Downie had tried to prevent by suggesting a leave of absence in lieu of resignation and facilitating a schedule adjustment requested by Page's stepfather to address concerns Page's parents had about their daughter's behavior and schoolwork (Dkt. No. 60, ¶ 61). Page testified that she would have continued working there, if they took her complaint seriously by separating her and D.J. Thompson and implementing appropriate remedial action (*Id*.).  Page further understood that, if she did not provide two weeks' notice, she would receive a negative reference from Chili's for future employment, which influenced her decision to resign formally (*Id*.).

On the afternoon of May 4, 2021, Marshall followed up with Page via text message and requested that she provide D.J. Thompson's explicit photograph (Dkt. Nos. 51-2, ¶ 62; 60, ¶ 62). Page's mother, Vanessa Saunders Page ("Saunders"), had previously grounded Page and confiscated her cellphone due to behavioral problems and poor grades (Dkt. Nos. 51-2, ¶ 63, 60, ¶

---

she read, understood, and agreed to follow BIPC's policies, procedures and practices (Dkt. No. 51-19).  Holdcraft's arguments about the inadequacies of the training process do not dispute her statement to Marshall.  Accordingly, the Court will consider Defendants' statement of fact admitted for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

[10]    Defendants' statement of fact is supported by relevant, admissible testimony in the record before the Court, and the Commission does not support its dispute of this statement of fact with a citation to relevant, admissible testimony in the record before the Court as required by Federal Rule of Civil Procedure 56(c).  Accordingly, the Court will consider Defendants' statement of fact admitted for purposes of this motion.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").

63).    After informing BIPC the evening of May 4, 2021, of Page's resignation effective immediately, Saunders agreed to speak with Marshall, who explained the situation to her and requested the photograph to complete his investigation (Dkt. No. 60, ¶ 64).  On May 5, 2021, Saunders provided Marshall with a photograph of a penis D.J. Thompson appeared to have sent to Page on April 14, 2021 (*Id.*, ¶ 65).

Based on the evidence he collected, including the photograph of a penis that D.J. Thompson sent to Page from his phone, Marshall completed his investigation on May 5, 2021, and issued his report, which recommended D.J. Thompson's termination (*Id.*, ¶ 66).  In accordance with Marshall's recommendation, BIPC terminated D.J. Thompson's employment the same day, over D.J. Thompson's continued denials of wrongdoing (*Id.*, ¶ 67).

### F.    The Commission Initiates This Action

On or around October 5, 2021, over five months after she resigned from BIPC, Page filed a Charge of Discrimination with the Commission alleging that she was subjected to sex discrimination and retaliation under Title VII (Dkt. No. 60, ¶ 68).  Neither Bentz, Holdcraft, nor Sharp ever filed Charges of Discrimination against Defendants with the Commission (*Id.*, ¶ 69).

On September 12, 2022, the Commission initiated this action by filing a complaint alleging Defendants "subjected Charging Party [Page] and the [C]lass [M]embers to unlawful harassment and a hostile work environment based on sex (female) and constructively discharged Charging Party" in violation of Title VII (*Id.*, ¶ 70).  During discovery, the Commission identified the Class Members, but neither they nor Page intervened as plaintiffs (*Id.*, ¶ 71).

Page testified that D.J. Thompson sexually harassed her on four occasions between late March and early-to-mid April 2021, but no one witnessed any of the alleged incidents (*Id.*, ¶ 72).

Bentz testified that, on a single occasion, sometime in the beginning of April 2021, D.J. Thompson "stuck his hand in [her] pants" for a few seconds over her underwear, but no one witnessed the alleged incident (*Id.*, ¶ 73).  Bentz also asserts that D.J. Thompson gave her flirtatious looks and would look her up and down (*Id.*).  Bentz says that D.J. Thompson did not just do this to her, but she saw him do this to Page a couple of times (*Id.*).  According to a police report, Bentz initially told an investigating police officer that "she did not have anything to say and she did not care about the situation and nothing really happened." (Dkt. Nos. 51-2, ¶ 74; 60, ¶ 74).  Holdcraft testified that, on a single occasion, D.J. Thompson "tried to grab [her] butt," but admitted she "couldn't tell" when the incident supposedly happened (Dkt. No. 60, ¶ 75).

Sharp testified that she experienced an alleged incident involving D.J. Thompson in which she claimed that he followed her into a walk-in freezer, "got up in her face and said 'come on let me touch up on it,'" but "he didn't try and reach at her or anything" and "backed off" when "she was very assertive" with him, after which "she didn't have a problem with him." (Dkt. Nos. 51-2, ¶ 78; 60, ¶ 78).  Sharp also testified that D.J. Thompson would walk past her and be a little too close and would stare you up and down (Dkt. No. 60, ¶ 78).  Sharp admitted that she never informed anyone at Chili's of the alleged freezer incident or about D.J. Thompson doing anything to make her uncomfortable (*Id.*, ¶ 79).

Bentz, Holdcraft, and Sharp denied exchanging any text messages with D.J. Thompson, and the Commission has neither identified nor offered evidence of any other "teens" D.J. Thompson allegedly harassed (*Id.*, ¶ 81).

In response to an interrogatory asking, "[t]o the extent that you contend Defendants were obligated to inform Charging Party's parents of Charging Party's allegations, describe in detail the legal and factual bases for your contention," the Commission responded, in part:

> While Plaintiff is not aware that Defendant had a legal obligation to contact the parents of the minor children who were abused by Mr. D.J. Thompson, Plaintiff believes Defendant had a moral obligation to do so.  Because Mr. D.J. Thompson's conduct violated the law, Defendant should have felt obligated to report his conduct to the parents of the minor child.  And while an employer is not a mandatory reporter of suspected child abuse in Arkansas, again Defendant should have felt some obligation to report this conduct to the parents of the minor child.

(Id., ¶ 83).

## II.    Legal Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact for trial).

Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp*., 477 U.S. at 322.  "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co*., 377 F.3d 917, 923–24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone

to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)). "Although employment discrimination cases are 'often fact intensive and dependant [sic] on nuance in the workplace, they are not immune from summary judgment.'" *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077).

### III.   Analysis

The Commission brings this action against Defendants on behalf of four Class Members who worked together at Chili's, asserting that all four were subject to sexual harassment and one was constructively discharged in violation of Title VII (Dkt. No. 1). The Commission cites in its complaint § 706(f)(1) and (3) of Title VII as the basis for this lawsuit (Dkt. No. 1, ¶ 3). 42 U.S.C. § 2000e-5(f)(1) and (3). Section 706 permits the Commission to sue a private employer on behalf of a "person or persons aggrieved" by the employer's unlawful employment practice. 42 U.S.C.

§ 2000e5(f)(1).  The Commission may file a § 706 lawsuit against a private employer, after the filing of a charge of unlawful employment discrimination with the Commission, if the Commission finds "reasonable cause" the employer has violated Title VII.

The Commission is "master of its own case" when bringing suits on behalf of aggrieved persons in a § 706 lawsuit.  *E.E.O.C. v. Waffle House,* 534 U.S. 279, 291 (2002).  The Commission may bring suit with or without the consent of the aggrieved persons.  *Id.*, at 291–92.  However, the Commission stands in the shoes of those aggrieved persons, meaning the Commission must prove all of the elements of a sexual harassment claim to obtain individual relief for each aggrieved person.  *E.E.O.C. v. CRST Van Expedited, Inc*., 611 F. Supp. 2d 918, 929 (N.D. Iowa 2009).  Likewise, the full range of legal remedies available to individuals is generally available to the Commission if the Commission prevails on their behalf, meaning the Commission is entitled to equitable relief, 42 U.S.C. § 2000e–5(g), and may also usually pursue compensatory and punitive damages, 42 U.S.C. § 1981a(a)(*l* ).  *CRST Van Expedited, Inc.*, 611 F. Supp.2d at 929.

## A.    Sexual Harassment Based On Hostile Work Environment

There are two types of sexual harassment claims under Title VII:  (1) quid pro quo harassment, "where an employee's submission to or rejection of a supervisor's unwelcome sexual advances is used as the basis for employment decisions[;]" and (2) "hostile work environment harassment, where 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 908 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "Sexual harassment is quid pro quo if a tangible employment action follows the employee's refusals to submit to a *supervisor's* sexual demands."  *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021,

1026-27 (8th Cir. 2004) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 752 (1998)) (emphasis added).

In this case, the Commission does not bring a claim of quid pro quo sexual harassment from a supervisor or manager.  Further, the parties do not dispute that D.J. Thompson was a co-worker, not a supervisor or manager, of the Class Members at the time of the alleged sexual harassment.  Accordingly, the Court will analyze the Class Members' sexual harassment claims as hostile work environment claims.

To establish a *prima facie* case of hostile work environment harassment, the Class Members must show:  (1) that they are members of a protected group; (2) that they were subjected to unwelcome harassment; (3) that the harassment was based on their membership in the protected group; and (4) that the harassment affected a term, condition, or privilege of their employment. *Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 540 (8th Cir. 2014).  The Class Members do not assert that a supervisor caused the harassment.  Instead, their hostile work environment claim is based on harassment by a co-worker.  As a result, to recover, the Class Members must also prove that the employer "knew or should have known of the harassment and failed to take prompt and effective remedial action."  *Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018).

"When the harasser is a co-worker, an employer is liable only if it 'was negligent with respect to the offensive behavior.'"  *Neel v. CRST Expedited, Inc.*, Case No. C18-98-LTS, 2020 WL 1052520, at *7 (N.D. Iowa Mar. 4, 2020) (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013)).  To establish a co-worker hostile work environment claim, the Class Members must show both that D.J. Thompson's actions created a hostile work environment and that the employer's "negligence le[d] to the creation or continuation of [the] hostile work environment."

19

*Id.* (quoting *Vance*, 570 U.S. at 446).  In this context, negligence means that "the employer knew or reasonably should have known about the harassment but failed to take remedial action."  *Id.* "To fulfill its duty to remedy sexual harassment in the workplace, an employer is obligated to take action that is 'reasonably calculated to stop the harassment.'"  *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).

Defendants argue that, even if the Commission on behalf of the Class Members can establish the first three elements of the *prima facia* case of a hostile work environment claim, the Commission has failed to show that the Class Members' work environment was objectively hostile and has failed to show that any of the Class Members subjectively perceived the work environment as abusive (Dkt. No. 52, at 15–17).

To satisfy the fourth element of the *prima facie* case, that the sexual harassment affected a term, condition, or privilege of employment, a plaintiff must demonstrate that the environment was objectively hostile and that she "subjectively perceive[d]" the environment as "abusive." *Gibson v. Concrete Equipment Company, Inc.*, 960 F.3d 1057, 1063 (8th Cir. 2020) (citing *Harris*, 510 U.S. at 21–22)).  The Commission must prove that the workplace was "permeated with discriminatory intimidation, ridicule, and insult."  *Harris*, 510 U.S. at 21.  Harassment "standards are demanding—to be actionable, conduct must be extreme and not merely rude or unpleasant." *Alagna v. Smithville R–II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003).  More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment.  *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 967 (8th Cir. 1999).  Courts consider the "totality of the circumstances" to determine whether a work environment is hostile or abusive.  *Baker v. John Morrell & Co.*, 382 F.3d 816, 828 (8th Cir. 2004).

For example, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Defendants argue that the alleged harassment was not objectively hostile toward Holdcraft and Sharp and that the Class Members did not view their working environment as abusive in order to meet the subjective element of a hostile work environment claim (Dkt. No. 52, at 15–20). The Commission responds that all the Class Members were subjected to unwelcome sexual harassment that affected a term, condition, or privilege of employment (Dkt. No. 59, at 17–21). The Commission also alleges that a single incident of harassment can result in a hostile work environment, but this is not a case where the Class Members are alleging a single incident of harassment (*Id*., at 18). The Commission contends that D.J. Thompson created a hostile work environment for all the Class Members because, according to Page and Holdcraft, he frequently "stared" at them (*Id*., at 20).

The Court has examined all the record evidence and has construed the record evidence in the light most favorable to the Commission. Holdcraft describes an unsuccessful attempt by D.J. Thompson to grab her buttocks, but Holdcraft admitted that she "couldn't tell" when the incident supposedly happened (Dkt. No. 60, ¶ 75). Holdcraft also asserts that D.J. Thompson made comments like, "you're hot," and that she observed D.J. Thompson try to grab Page's "boobs," try to grab her "butt," and try to kiss her (*Id*., ¶ 25). Holdcraft says that she does not know how many times because it was "way too many."[11] (Dkt. No. 60-2, at 30).

---

[11] There are discrepancies between what the Commission represents regarding Holdcraft's testimony in its brief and what Holdcraft's actual testimony is (Dkt. No. 59, at 17). The Commission argues that "Holdcraft testified *she observed Thompson grab* Page's 'boobs,' her 'butt,' and kiss her" and that Holdcraft testified that "she saw Thompson do this *too many times to count*." (*Id*., at 17) (emphasis added). Holdcraft actually testified that she saw where D.J. "*tried*

Sharp testified that in March or April 2021 she experienced an alleged incident involving D.J. Thompson in which she claimed that he followed her into a walk-in freezer, and he "got up in her face and said 'come on let me touch up on it,'" but "he didn't try and reach at her or anything" and "backed off" when "she was very assertive" with him (*Id.*, ¶ 78).  After that, Sharp "didn't have a problem with him." (*Id.*).  Both Holdcraft and Sharp testified that D.J. Thompson would walk past them a little too close and would stare at them up and down (*Id.*, ¶¶ 25, 78).  On four occasions between late March and early-to-mid April 2021, D.J. Thompson groped Page's private areas, grabbed her breast, and kissed her on the mouth (*Id.*, ¶ 28).  On one occasion in April 2021, D.J. Thompson stuck his hand in Benz's pants for a few seconds over her underwear (*Id.*, ¶ 73).  D.J. Thompson also gave Bentz flirtatious looks, and she saw him do the same to Page (*Id.*, ¶ 72).  The alleged incidents involving D.J. Thompson all occurred during a period of four months, after D.J. Thompson was hired on December 21, 2020, and before the alleged harassment was reported to Defendants for the first time by Holdcraft on April 16, 2021 (*Id.*, ¶¶ 18, 25).  At all times, the Class Members continued to perform their jobs.

Under controlling law in the Eighth Circuit, a plaintiff's claims must describe a level of conduct that is pervasive, severe, and intimidating to sustain a hostile work environment claim. *See Duncan v. GMC*, 300 F.3d 928, 933 (8th Cir. 2002) (determining that defendant was entitled to judgment as a matter of law because harassment was not severe and pervasive in order to create a hostile work environment in workplace where the plaintiff complained about a co-worker who, over a two-year period, requested a relationship with her; briefly touched her hand on four or five

---

*to grab* [Emily's] boobs, her butt.  He's tried to grab her and kiss her." (Dkt. No. 60-2, at 29:11–25) (emphasis added).  When Holdcraft was asked how many times she saw this happen, she replied "*way too many*." (*Id.*, at 30:15–16) (emphasis added).  This Court relies on the record evidence.

occasions; asked her to use his computer, which had a picture of a naked woman as the screen saver; asked the plaintiff to draw his planter, which had a hole in the front of a man's pants that allowed a cactus to protrude; and kept a child's pacifier that was shaped like a penis in his office that he showed to the plaintiff on two occasions); *Alagna*, 324 F.3d at 980 (determining that a male teacher's touching a female teacher, telling her that he loved her, and acting inappropriately for two years was not sufficiently severe to satisfy a claim for hostile work environment sexual harassment); *LeGrand v. Area Res. for Cmty. & Human Servs.*, 394 F.3d 1098, 1100–03 (8th Cir. 2005) (determining that unwelcome sexual advances by alleged harasser, including asking plaintiff to watch pornographic movies and "jerk off" to relieve stress, kissing plaintiff, grabbing plaintiff's buttocks, reaching for his genitals, brushing plaintiff's crotch area with the back of his hand, and gripping plaintiff's thigh under a table during a meeting, were not so severe or pervasive as to "poison" the plaintiff's work environment); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 551–52 (8th Cir. 2007) (concluding that co-workers' repeated comments about plaintiff's body, repeated requests for dates, and two incidents of touching did not amount to severe or pervasive conduct); *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858, 862 (8th Cir. 2009) (determining that alleged harasser's conduct, including rubbing plaintiff's shoulders and back, calling her "baby doll," insinuating that she could go farther in the company if she got along with him, and accusing her of not wanting to be "one of my girls," was not sufficiently severe or pervasive enough to alter a term, condition, or privilege of her employment); *McMiller v. Metro*, 738 F.3d 185, 188 (8th Cir. 2013) (alleged harasser's conduct, including kissing plaintiff on two occasions, placing or attempting to place his arms around her three times, and requesting she remove an ingrown hair from his chin, did not rise to the level of severe or pervasive conduct).

Given the high bar under controlling Eighth Circuit law, it is not clear that the Commission can satisfy the objective standard to maintain a hostile work environment claim.

Further, based upon the undisputed record evidence, here none of the Class Members perceived D.J. Thompson's behavior as severe enough to report it voluntarily to management. None of the Class Members reported harassment from D.J. Thompson until Downie observed that Holdcraft was in an argument with a co-worker and, with effort, encouraged Holdcraft to talk with her about the argument she was having with co-worker Isaiah Thompson. It was Holdcraft reporting she was upset with Isaiah Thompson about Page that led to Downie learning of the alleged behavior of D.J. Thompson. Even after reporting harassment to management, Page and Bentz stated that they would not speak with the TMR investigator, despite being aware of an obligation to do so (Dkt. No. 60-4, 91:1–10).

After reporting the alleged harassment to management, Page told Brown that she did not care if she was scheduled to pick-up a shift where she worked with D.J. Thompson. This testimony is contradicted somewhat by Page's post-deposition declaration in which she states that she was "uncomfortable" working with D.J. Thompson after reporting the alleged harassment and that she was scared, but there is no record evidence that Page reported to management at the time that she was uncomfortable or scared. "[A]n employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007) (*reh'g and reh'g* en banc denied 2007) (quoting *Williams v. Mo. Dep't of Mental Health*, 407 F.3d 972, 977 (8th Cir. 2006) *cert. denied*, 546 U.S. 1091 (2006)).

Similarly, Bentz told management that she did not want D.J. Thompson to be fired because it would be "unfair," but she later explained this statement by saying that she thought D.J.

Thompson should have been suspended instead.  Bentz later told an investigating police officer that "she did not care about the situation and nothing really happened." (Dkt. No. 60, ¶ 74).

Holdcraft declined to speak with the EEOC during its investigation of Page's Charge. Further, at her deposition Holdcraft "couldn't tell" when the alleged incident of D.J. Thompson attempting to "grab [her] butt" occurred (Dkt. No. 60, ¶ 75).  Sharp admitted that she never complained about or reported any sexual harassment by D.J. Thompson at all and that, after "she was very assertive" with him, "she didn't have a problem with him." (Dkt. No. 60, ¶ 79).  Sharp further admitted that she "didn't realize it was really an issue" until the Commission contacted her later (*Id*., ¶ 80).  At that time, she told the investigator that she had no interest in pursuing any claims or becoming a class member (*Id*.).  Based on the record evidence, even with all reasonable inferences construed in favor of the Class Members, the Commission has not shown that a reasonable jury could conclude that all of the Class Members subjectively perceived their working environment to be abusive.

The Court determines that, at least as to Holdcraft and Sharp, no reasonable jury could conclude, based on the record evidence before it with all reasonable inferences from the record evidence construed in favor of the Class Members, that the Class Members have shown that their work environment was objectively hostile or that the Class Members subjectively perceived their work environment as abusive.

> ### B.    The Commission Has Not Shown That Defendants Knew Or Should Have Known Of Any Harassment And Failed To Take Appropriate Corrective Action

Even if a reasonable jury could conclude from the record evidence that the Class Members' work environment was objectively hostile and that they subjectively perceived the work environment as abusive, the Commission must also show that Defendants knew or should have

known of the harassment but failed to take corrective action. *See Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 419 (8th Cir. 2010). Where an employer takes prompt remedial action that is reasonably calculated to stop the harassment, the employer is not liable for the underlying sexual harassment. *Id*.; *see also Sellars v. CRST Expedited, Inc.*, 13 F.4th 681, 696 (8th Cir. 2021). The Commission has not come forward with sufficient record evidence on this point; no reasonable jury could conclude from the record evidence with all reasonable inferences drawn in favor of the Class Members that Defendants knew or should have known of any harassment but failed to take corrective action.

Determining the existence of an employer's liability involves a two-step inquiry: (1) whether the employer had actual or constructive notice of the conduct, *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 690 (8th Cir. 2012) (citing *Sandoval v. Am. Bldg. Maint. Indus.*, 578 F.3d 787, 801 (8th Cir. 2009)), and (2) whether the employer took remedial action "reasonably calculated to stop the harassment." *Engel*, 506 F.3d at 112 ("Proper remedial action need be only reasonably calculated to stop the harassment, and remedial action that does not end the harassment can still be adequate if it is reasonably calculated to do so.") (internal quotations and citations omitted); *see also Alvarez*, 626 F.3d at 421 ("If an employer responds to harassment with prompt remedial action calculated to end it, then the employer is not liable for the harassment.") (citation omitted). "Employees often must 'tolerate some delay,' . . . so that an employer can 'gauge the credibility of the complainant and the seriousness of the situation.'" *Id*. (quoting *Dhyne v. Meiners Thriftway, Inc.,* 184 F.3d 983, 988 (8th Cir. 1999)) (determining that employer's actions were reasonably calculated to stop the harassment even though there was a delay of 21 days from the time that harassment was first reported until the time employer suspended harasser).

### 1.    Constructive Notice

The Commission argues that the harassment of the Class Members was known to other employees including Certified Shift Lead Alyssa Downie starting in at least February 2021 (Dkt. No. 59, at 3).  The Commission points to Sharp's deposition testimony.  Sharp testified:

> I heard one of the line people that like put the plates together or one time D.J. had said something toward me and she yelled out like come on D.J., don't go flirting with the minors or with the little something but definitely come on D.J., don't go flirting with something like that and that definitely happened from her.  Then there was a girl that D.J. dated who like worked on the bar or something or like - - yeah - - bartended and she said something kind of along those lines but it was just like oh, D.J. flirting with the young ones again or something like that.

(Dkt. No. 60-15, at 60–61).

Even assuming that Downie was present for both comments, the comments are insufficient as a matter of law to give Defendants constructive notice of harassment.  First, the Commission has not established that Downie, who was a Certified Shift Lead and hourly employee in February 2021, was "management level personnel" (Dkt. No. 60-3, at 16-17).  Second, even if the Commission can establish that Downie is management level personnel, to show an employer's constructive knowledge of sexual harassment, an employee must demonstrate that "the harassment was so severe and pervasive that management reasonably should have known of it."  *Weger*, 500 F.3d at 722 (quoting *Watson,* 324 F.3d at 1259) (citing *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1265 n. 3 (8th Cir. 1997)) (recognizing that constructive notice of harassment exists where "the harassment was obvious to everyone"); *Taylor v. Jones,* 653 F.2d 1193, 1199 (8th Cir. 1981) (affirming the district court's finding that "the atmosphere of racial discrimination and of prejudice was so pervasive and so long continuing . . . that the employer must have become conscious of it.").  Stray comments of a co-worker, like those referenced by the Commission, are insufficient to give an employer constructive knowledge of the possibility of sexual harassment. *Hossain v. Job*

*Serv. N. Dakota*, Case No. 1:20-cv-009, 2023 WL 2894349, at *18 (D. N.D. Apr. 11, 2023), *aff'd sub nom. Hossain v. Job Serv. of N. Dakota*, Case No. 23-1882, 2023 WL 8232205, at *19 (8th Cir. Nov. 28, 2023) (determining employer was entitled to summary judgment on hostile work environment claim based on "sporadic and casual" comments made by co-workers of which decisionmakers were not aware).

For example, in *Weger*, the Eighth Circuit affirmed the district court's decision that six separate observations of harassment, which "occurred over a substantial period of time" with "no single officer observ[ing] more than three incidents," were not enough to impute constructive notice to an employer. 500 F.3d at 722. At issue in *Weger* were comments by a police officer about his co-worker's breasts, inappropriate touching of the same co-worker, and indications that the co-worker did not welcome the harasser's advances. *Id*. Such activity was observed on at least six occasions by other co-workers and *supervisors*, though "no single officer observed more than three incidents" of inappropriate conduct. *Id*. (emphasis added). The Eighth Circuit found that, because the six instances "lack[ed] the requisite pervasiveness to support a finding that [harassment] 'was obvious to everyone,'" constructive notice could not be imputed to the employer. *Id*. (quoting *Smith*, 109 F.3d at 1265 n.3).

Here, the Commission asserts that two sporadic comments were made by random co-workers that D.J. Thompson flirts with minors or "little girls" and that D.J. Thompson's "behavior" equating him to a "creep" was "common knowledge" among staff. There is no record evidence to support instances of physical touching or of targeted comments towards the Class Members about which supervisors or management were aware before the conversation Holdcraft had with Downie on April 16, 2021. Further, the record evidence cited by the Commission to support the assertion that D.J. Thompson's harassment was "common knowledge" among staff is the testimony of Class

Members Sharp and Holdcraft.  When asked at her deposition whether it was "common knowledge" that D.J. flirted with young girls, Sharp stated "[k]ind of" (Dkt. No. 60-15, 77:4–22).  Similarly, Holdcraft testified that it was "kind of common knowledge to everybody that [D.J. Thompson] was kind of a creep." (Dkt. No. 59, at 22; 60-15; 77:4–22; 60-2, at 22:5–7).  No reasonable jury could conclude from this testimony of Sharp and Holdcraft, even if true and even with all reasonable inferences drawn in favor of Class Members, that D.J. Thompson's alleged harassment was pervasive or that D. J. Thompson's alleged harassment was obvious to everyone.

The Court concludes based on the record evidence before it, construing all reasonable inferences in favor of the Commission, that no reasonable jury could find sufficient evidence to put Defendants on constructive notice that D.J. Thompson was harassing the Class Members in February 2021, based on the stray comments asserted.  *See Weger*, 500 F.3d at 722; *Story v. Riceland Foods, Inc.*, Case No. 5:10-cv-00090-JLH, 2010 WL 5211492, at *3–4 (E.D. Ark. Dec. 15, 2010) (granting summary judgment, in part, because Story failed to provide evidence that anyone witnessed the alleged harassment and plaintiff failed to report it); *Hossain*, 2023 WL 8232205, at *19 (determining that "sporadic and casual" comments made by co-workers of which decisionmakers were not aware were insufficient to establish a claim of hostile work environment).

### 2.    Actual Notice

Here, based on the undisputed record before the Court, Defendants first had actual notice of some alleged harassment as to at least Holdcraft, and perhaps Page, late in the evening on April 16, 2021, when Holdcraft reported allegations of harassment by D.J. Thompson to Downie (Dkt. No. 60, ¶ 25).  Holdcraft reported D.J. Thompson made sexual comments to her and Page, such as:  "Oh, you're hot.  I mean just small things that a 30-year-old shouldn't say to a 16-year-old." (*Id.*).  Holdcraft said D.J. Thompson made comments about their butts, figures, and how they look

and would tell her, "Oh you're hot" like just "being a pig looking at some child like a piece of meat." (*Id*.). Holdcraft stated, "You couldn't even walk past [D.J. Thompson] without him looking at you or looking at your butt or if he could walk past you, he couldn't help it but kind of just ride his hand over you." (*Id*.). Holdcraft also reported that D.J. Thompson tried to grab her butt (*Id*.). Later that night, Downie reported Holdcraft's allegations to Brown.

On April 17, 2021, prior to management meeting with Page and prior to Page alleging any harassment by D.J. Thompson, D.J. Thompson worked with Page (Dkt. No. 60, ¶ 5). Based on the undisputed evidence taken in the light most favorable to Class Members, D.J. Thompson did not physically touch or speak to Page in a sexual manner during their shift on April 17, 2021, or any time after that until his termination on May 5, 2021.[12]

On April 18, 2021, Brown and Hefner spoke with Page and Bentz in the parking lot. They both reported that they were being harassed by D.J. Thompson and that they did not want to return to work that day if he was going to be there (Dkt. No. 60-35, at 42). On the same day Brown and Hefner met with D.J. Thompson, told him that allegations were made against him, and sent him home. At that meeting, D.J. Thompson denied any wrongdoing and claimed that Page had touched his buttocks.

On April 20, 2021, Brown contacted TMR, and Defendants initiated an investigation into the allegations (Dkt. No. 60, ¶ 38). Management informed the Class Members in a text message from Brown that Defendants had initiated a formal investigation and that management would attempt to separate them from D.J. Thompson as much as possible (*Id*.).

---

[12] While there is some suggestion that D.J. Thompson continued to "stare" at Class Members Holdcraft and Page, there is no record evidence that the stares were reported to management or reported to management as ongoing harassment at the time.

The TMR investigator had some difficulty arranging interviews with the Class Members. Holdcraft testified that she ended a call with the investigator when she accidentally answered the call while at school (Dkt. No. 60, ¶ 49). Page testified that she did not respond to the investigator because her phone had been confiscated by her mother (*Id*.). Page also admitted that she did not want to talk to the TMR investigator. Page sent a message to Bentz stating, "I'm not telling the investigators anything," and Bentz replied, "I'm not either." (Dkt. Nos. 60-35, at 48:24–49:2, 51:21–52:11, 53:3–25, 62:5–63:4; 60-7, at 95:24–96:5, 99:17–25).

On May 4, 2021, Page and Bentz spoke with the TMR investigator for the first time at Chili's. Bentz reported that, on one occasion in April 2021, D.J. Thompson stuck his hand in Benz's pants for a few seconds over her underwear (Dkt. No. 51-9, at 59:2-60:11). Page reported that D.J. Thompson followed her into a walk-in cooler on multiple occasions, attempted to grope and kiss her, placed her hand on his penis, and sent her a picture of his penis (Dkt. No. 60-14).

On May 5, 2021, as a result of the details provided to the TMR investigator by Page and Bentz, and after receiving, the photograph that D.J. Thompson sent to Page from his phone, Defendants terminated D.J. Thompson's employment (Dkt. No. 60, ¶¶ 65–67).

Based on the record evidence, viewed in the light most favorable to the Commissioner, no reasonable jury could conclude that Defendants had actual notice of D.J. Thompson's alleged harassment before April 16, 2021.

### 3.    Were The Remedial Actions Taken By Defendants Reasonably Calculated To Stop The Harassment

The Commission argues that the remedial actions taken by Defendants were defective in several ways. The Commission argues, based mostly on its constructive notice theory, that the remedial actions taken by Defendants were not prompt (Dkt. No. 59, at 21–22). Because the Court finds, based on the evidence in the record viewed in the light most favorable to the Commission,

that Defendants did not have constructive notice of the harassment in February 2021, the Court rejects the Commission's theory that Defendants should have taken remedial action prior to April 16, 2021, when Defendants received actual notice.

Further, the Commission faults Defendants for not beginning an investigation until April 20, 2021, and then the TMR investigator for not trying "to reach Page and Holdcraft until May 4, despite their availability." (Dkt. No. 59, at 23). The Commission misstates the record evidence. The record evidence indicates that Downie investigated when she discovered that Holdcraft was upset on April 16, 2021, and came to hear about Holdcraft's allegations of harassment involving D.J. Thompson. She reported these allegations to her supervisor, Brown, the same day. By April 20, 2021, Brown had sent an email to TMR, and TMR had initiated an investigation. The TMR investigator's report indicates that he reached out to both Page and Holdcraft on April 20, 2021, the same day TMR initiated the investigation (Dkt. No. 60-14, at 3).

The Court determines that a four-day delay in beginning the investigation was not unreasonable under the circumstance. *See Alvarez*, 626 F.3d at 419 (8th Cir. 2010) ("Employees often must 'tolerate some delay,' . . . so that an employer can 'gauge the credibility of the complainant and the seriousness of the situation.'") (quoting *Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 988 (8th Cir. 1999) (determining that employer's actions were reasonably calculated to stop the harassment even though there was a delay of 21 days from the time that harassment was first reported until the time employer suspended harasser)).

The Commission argues that Defendants' anti-harassment policies were inadequate (Dkt. No. 59, at 23–25). The Commission maintains that Defendants did not tailor their training on their EEO and anti-harassment policies and procedures towards the Class Members, who were minors (Dkt. No. 59, at 23–25). The Commission acknowledges, however, that Defendants maintained

facially adequate EEO and anti-harassment policies (Dkt. No. 59, at 23). Further, on the record before the Court, considering all of record evidence in the light most favorable to the Commission, all of the Class Members and D.J. Thompson signed documents acknowledging that they read, understood, and agreed to follow Defendants' policies, procedures, and practices and would ask for an explanation from either their manager or from PeopleWorks if the policies contained anything they did not understand (Dkt. No. 51-2, ¶¶ 12-14).

The Commission cites to *EEOC v. V & J Foods, Inc.* ("*V & J Foods*"), a Seventh Circuit case involving supervisor harassment, to support its assertion that Title VII imposes additional obligations on employers in matters involving minor employees. 507 F.3d 575 (2007). The Seventh Circuit case is not binding in the Eighth Circuit, and the Court is not aware of a similar Eighth Circuit case imposing such additional obligations. Additionally, *V & J Foods* involved supervisor harassment and an internal complaint policy which the Court determined would have "confused even adult employees." *V & J*, 507 F.3d at 578. Supervisor harassment is not at issue here. It is undisputed that D.J. Thompson was a co-worker. Further, a confusing policy is not at issue here. Here, the Commission has conceded that Defendants' EEO and anti-harassment policies are facially adequate (Dkt. No. 59, at 23).

The Commission's other assertion about Defendants' policies and procedures is that the Class Members did not receive them, but both Page and Bentz testified that the policies could be accessed from home with a laptop (Dkt. Nos. 60-35, at 20:16–19; 21:4–6; 60-7, at 37:1–15, 48:18–25).

To the extent that the Commission is claiming that Defendants had an affirmative obligation but failed to prevent the alleged harassment by D.J. Thompson before Defendants even became aware of it, that claim is not supported by the law of the Eighth Circuit or the undisputed

evidence in this case.  In the Eighth Circuit, the standard applicable to co-worker harassment is that "[a]n employer is required to take reasonable remedial action *in response to* allegations of harassment."  *Sellars*, 13 F.4th at 699 n.8 (emphasis added) (determining that employer was not required to preemptively install on-truck cameras to better monitor trucks and assist with investigation of harassment).  Because there is no dispute on the record before the Court that D.J. Thompson was not a supervisor, the Court determines that Defendants did not have a duty to prevent harassment by D.J. Thompson about which Defendants were unaware under the circumstances of this case and under controlling Eighth Circuit law.

The Court determines, based on the record evidence taken in the light most favorable to the Commission, that no reasonable juror could conclude that Defendants failed to take sufficient remedial action reasonably calculated to stop the harassment after Defendants received actual notice of the alleged harassment on April 16, 2021.  *See Sellars*, 13 F.4th at 697 (determining that, even though some harassment of the employee continued after the employer's initial remedial response, the employer's remedial response was calculated to stop the harassment and was adequate); *Story*, 2010 WL 5211492, at *4–5 (determining that employer's remedial actions were reasonably calculated to stop the harassment; employer spoke to alleged harasser and victim was not subject to further harassment); *Poole v. Southern Arkansas Univ. Tech. Coll.*, Case No. 04-cv-1089, 2006 WL 1096373, at *5–6 (W.D. Ark. April 25, 2006) (determining that employer's actions, including immediately investigating and reprimanding, but not firing the alleged harasser as plaintiff desired, were "prompt and effective, as a matter of law").  Here, after Holdcraft reported alleged harassment on April 16, 2021, and Page and Bentz reported alleged harassment on April 18, 2021, Defendants initiated an investigation into the alleged harassment that resulted in D.J. Thompson's termination, and it is undisputed that D.J. Thompson stopped physically touching and

speaking to the Class Members in a sexual manner immediately after the first allegations of harassment were reported to management.

For the foregoing reasons, the Commission has failed as a matter of law to establish a hostile work environment claim against Defendants. This does not, of course, suggest that D.J. Thompson's alleged conduct was anything other than unacceptable. The question for the Court in this case is whether Defendants are liable for their alleged conduct, under controlling Eighth Circuit law given the circumstances. Under the controlling legal standards that apply to the record evidence before the Court, when all reasonable inferences from that record evidence are construed in favor of Class Members, the Court concludes that no reasonable juror could determine Defendants are liable. Accordingly, Defendants are entitled to summary judgment on the Commission's hostile work environment claims.

### C.    Constructive Discharge

The Commission argues that a reasonable jury could find that Page was constructively discharged. The Court disagrees.

To prove constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit. *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247 (8th Cir. 1998). "To prove a case of constructive discharge, a plaintiff must show (1) a reasonable person in [her] situation would find the working conditions intolerable, and (2) the employer intended to force [her] to quit." *Rickard v. Swedish Match N. Am., Inc.*, Case No. 3:12-cv-00057 KGB, 2013 WL 12099414, at *10 (E.D. Ark. Nov. 25, 2013), *aff'd*, 773 F.3d 181 (8th Cir. 2014) (quoting *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 534 (8th Cir. 2008)). "The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings." *Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 893 (8th

Cir. 2012) (footnote omitted) (quoting *Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000)). "Accordingly, to prevail on a constructive discharge claim, a plaintiff must show that his 'working conditions were rendered so objectionable that a reasonable person would have deemed resignation the only plausible alternative.'" *Rickard*, 2013 WL 12099414, at *10 (quoting *Tatom,*, 228 F.3d at 932). Further, a constructive discharge claim carries a higher evidentiary burden than a hostile work environment claim. *See Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) ("A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."). A claim of "[c]onstructive discharge requires considerably more proof than an unpleasant and unprofessional environment." *Duncan*, 300 F.3d at 936 (quoting *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002)). "An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* at 935.

The Commission argues that conditions were so intolerable for Page at Chili's that a reasonable person would have felt compelled to quit (Dkt. No. 59, at 26–28). The Commission argues that Defendants did not make any "attempt to separate her from her accuser [sic] on April 17, 2021, or even April 18, 2021, when Thompson arrived at work, clocked in, and started his shift." (*Id.*, at 26–27). Further, the Commission complains that management continued to schedule Page to work shifts with D.J. Thompson until his termination on May 5, 2021 (*Id.*, at 27).

The Court agrees that, based on the record evidence when construed in favor of Page, the actions taken by management to separate Page from D.J. Thompson do not appear ideal. However, the Court also concludes that, based on the record evidence when construed in favor of Page, no

reasonable jury could conclude that the conditions experienced by Page were so intolerable that a reasonable person would have felt compelled to quit.

The Commission faults management for permitting Page to work with D.J. Thompson on April 17, 2021. However, record evidence establishes that was the day after Holdcraft made allegations of harassment against D.J. Thompson late the night before when prompted by Downie, and Page had not yet made her own allegations of harassment against D.J. Thompson. While it is true that Holdcraft had alleged that D.J. Thompson had made comments about both her and Page, Page did not speak with Brown and Hefner until the next day, on April 18, 2021. On that day, April 18, 2021, Page and D.J. Thompson overlap on the time records, for about 30 minutes, before management sent D.J. Thompson home (Dkt. No. 60, ¶ 5).

Based on the record evidence before the Court, Page acknowledged at her deposition that management made some effort, if not completely successful, to separate her from D.J. Thompson, including warning Page that D.J. Thompson would be present in the restaurant for a shift she requested to pick-up on April 26, 2021 (Dkt. No. 60-35, at 44–45). When asked directly about management scheduling her to work with D.J. Thompson at her deposition Page testified, "[s]o was Robert trying to schedule and separate - - attempting to separate the two of you, you and DJ," Page responded, "[y]es." (Dkt. No. 60-35, at 44). When Page was asked directly, "[h]ow many times did you see DJ after you reported this incident to Jacob [Hefner] and Robert [Brown]," Page responded that "at least a couple times," and "[l]ess than 10." (Dkt. No. 60-35, at 45). There also is record evidence that Page told the police investigator that the managers at Chili's changed her schedule around so that she did not have to work with D.J. Thompson as much as possible (Dkt. No. 60-33).

The Court acknowledges that, in total, the time records indicate that Page worked 16 hours and 35 minutes with D.J. Thompson during the 17 days after she reported D.J. Thompson's alleged harassment to Brown and Hefner until D.J. Thompson was terminated by Defendants on May 5, 2021 (Dkt. No. 60, ¶ 5).  Crediting Page's testimony and the timesheets, which show days and times that both Page and D.J. Thompson were clocked in simultaneously, management appears to have scheduled Page and D.J. Thompson at the same time for four shifts totaling 15 hours and 13 minutes (Dkt. No. 60, ¶ 5).  Based on the record evidence, Page was also on the clock with D.J. Thompson at least one shift because she voluntarily "picked up" the shift knowing that she and D.J. Thompson would be working together (Dkt. No. 60-5, at 14).    According to the Release/Approval History Report provided by the Commission (Dkt. No. 60-5, at 14), on April 25, 2021, Page worked one hour and 22 minutes with D.J. Thompson voluntarily after Brown approved the shift pick-up that Page texted him about, asking Brown to approve the shift "pick-up" stating, "i requested pick up for brandon's shift for tmrw night and I don't care if dj's there, just in case that was the reason for the delay" in approval (Dkt. No. 60, at ¶ 41).[13]  Based on the undisputed evidence in the record before the Court, viewed in the light most favorable to Page, D.J. Thompson did not physically touch or speak to Page in a sexual manner during any of the 16 hours and 35 minutes that Page worked with D.J. Thompson after reporting harassment to Brown and Hefner.

The Commissioner's argument that Page being scheduled to work with D.J. Thompson after reporting the harassment is sufficient to raise a genuinely disputed issue of material fact for

---

[13]  Page explains this April 25, 2021, text to Brown by saying that she told Brown she did not care "[b]ecause he was already scheduling me with him anyways and him still working there, we were going to cross paths." (Dkt. No. 60-35, at 44).  The first time Page and D.J. Thompson were scheduled to work together was April 24, 2021, the day before Page sent this text.  D.J. Thompson did not physically or verbally harass Page during her shift on April 24, 2021.

trial on the Commission's constructive discharge claim is not supported by the controlling law in

the Eighth Circuit. In *Tatum v. Arkansas Department of Health*, Tatum worked as a nurse in a unit

of the Arkansas Department of Health. 411 F.3d 955 (8th Cir. 2005). One day, Tatum entered the

breakroom, and a co-worker, McCuan, came up behind her and said "'I want you.' McCuan then

grabbed Tatum's hand, placed it on his penis, and asked Tatum, 'See how hard it is? Doesn't that

feel good?'" *Id*. at 957. Later that day, McCuan approached her in the parking lot and asked her

to come over for the weekend because his wife and granddaughter would be out of town. *Id*. Later

that afternoon, Tatum complained about the conduct to her unit administrator. The administrator

took no immediate action. *Id*. Five days later, Tatum confronted McCuan about his conduct, and

she asked the administrator to accompany her. *Id*. McCuan rose from his desk and told Tatum to

get out of his office. McCuan did not harass Tatum any further. Tatum immediately notified the

administrator's supervisor about the incident. The Arkansas Department of Health took another

week before it began its investigation. *Id*. at 958. Tatum testified that she was scared of the co-

worker because she had to work with him everyday and that she was shunned by her other co-

workers as a result of her complaint. *Id*. She resigned. *Id*.

The Eighth Circuit affirmed the district court's dismissal of Tatum's constructive discharge

claim before submitting the matter to the jury. *Id*. at 960. The Eighth Circuit determined that

"[t]hough Tatum was forced to work in the same office as McCuan, she presented no evidence of

any further harassment or inappropriate behavior. And, though she testified she was scared of

McCuan, it does not follow that this fear was reasonable, especially given that McCuan's alleged

behavior, while lewd, was not directly threatening." *Id*.; *see also Skare v. Extendicare Health

Servs., Inc.*, 431 F. Supp. 2d 969, 976 (D. Minn. 2006) (*aff'd* 515 F.3d 836 (2008), ("even assuming

the conditions under which [Skare] worked may have been unpleasant and tinged with retaliatory

acts, they do not create an objectively intolerable atmosphere that *forced* [Skare] to resign." (quoting *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241,1248 (8th Cir. 1998)) (emphasis in original) (internal quotation and alterations omitted); *Breeding v. Arthur J. Gallagher and Co.,* 164 F.3d 1151, 1160 (8th Cir. 1999) (rejecting constructive discharge claim, noting that "[t]he working atmosphere was not ideal, but a feeling of being unfairly criticized or having to endure difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign") (internal quotation and alteration omitted).

At her deposition, Page reported that she was "scared" of D.J. Thompson, but Page neither reported being scared of D.J. Thompson nor reported any ongoing harassment from D.J. Thompson to anyone on the management team from the time she first reported the harassment until she resigned her employment from Defendants on May 4, 2021 (Dkt. No. 60-35, at 111). Page's assertion that she was scared to work with D.J. Thompson is not objectively reasonable given that Page never reported her fear to management and given that, on at least one occasion after reporting the alleged harassment to management, Page voluntarily chose to pick-up a shift knowing that she would be working with D.J. Thompson and stated as much to management while seeking management's approval of the pick-up shift.

Further, on the record before the Court, when Page's mother resigned on her behalf on May 4, 2021, Page did not mention a fear of D.J. Thompson or any other intolerable working condition as a reason for her resignation. Instead, Saunders stated that Page needed to quit her job because Page was doing poorly in school, had been lying to her parents, and was being punished for disobeying her parents (Dkt. No. 60-3, at 66–67). Downie, who accepted the verbal resignation, reported that Page was crying, and Downie thought that it was because the job was very important to Page. *See Tobar v. Arkansas Dep't of Correction*, Case No. 2:07-cv-00153 JLH, 2009 WL

1286298, at *4 (E.D. Ark. May 7, 2009), *aff'd,* 371 F. App'x 707 (8th Cir. 2010) (determining that plaintiff, who did not complain to employer of other sexual harassment issues from co-workers after she made her sexual harassment claim, was unable to show she was constructively discharged).

Page testified that Defendants should have fired D.J. Thompson immediately after she reported the harassment (Dkt. No. 60-35, at 45), but Title VII does not require Defendants to fire D.J. Thompson pending an investigation into allegations of harassment. *See Poole*, 2006 WL 1096373, at *5 (determining that employer, who responded to allegation of harassment by changing work schedules of employees instead of firing alleged harasser as requested by the plaintiffs, adequately responded to the reported harassment because "Title VII does not require an employer to fire a harasser." (citing *Bailey v. Runyon*, 167 F.3d 466, 468 (8th Cir. 1999)).

Here, Defendants investigated the allegation. Based on record evidence, during the investigation, D.J. Thomspon denied the conduct, and at least one other employee provided evidence during the investigation casting doubt on the allegations. The Court acknowledges that Class Members deny statements attributed to them by the other employee. Defendants ultimately terminated D.J. Thompson's employment after Defendants completed the investigation. Record evidence supports that the investigation was delayed, at least in part, because of Page's admitted unwillingness to speak with Defendants' investigator. Further, only after informing Defendants the evening of May 4, 2021, of Page's resignation effective immediately, did Saunders agree to speak with Marshall, who explained the situation to her and requested the photograph to complete his investigation. On May 5, 2021, Saunders first provided Marshall with the photograph sent by D.J. Thompson. Based on evidence in the record before the Court viewed in the light most

favorable to the Commission, the Court concludes that no reasonable jury could find that Page's working conditions were so intolerable as to force her to quit.

Page also asserts, for the first time at her deposition, that she would have stayed if Defendants had taken her report of harassment seriously and separated her from D.J. Thompson or created a safe work environment (Dkt. No. 59, at 27).[14]   Again, the Court agrees that management's efforts to separate Page from D.J. Thompson were less than ideal, but the record evidence supports that Defendants made efforts to retain Page by investigating the allegations and by responding to both Page and her parents' concerns after Page's parents broached the possibility of her resignation with Downie (Dkt. No. 60-3, at 66–67).  Downie testified:

> It was a busy shift and I was in the kitchen and somebody said we need a manager in to–go.  I said, okay. I go over there and I'm thinking it's maybe somebody had something wrong with their food, but I see Emily with her parent and her mom said that she needed to quit her job in front of everybody because she was doing poorly with school and had been lying to them, and so it was her punishment for disobeying them as well as the poor grades.
> She was - - Emily was crying.  She was upset, because I knew that she had expressed to me other times that the job was really important to her when she was doing home schooling, she didn't have much contact with people her age.  And they were, you know, very emotional.
> The mother was angry, Emily was crying, and I'm like taken off guard.  And so I said, Okay, I understand school's very important.  It definitely comes first, but if you really do like this job, and you want to keep working here, if you just quit, they're not probably going to want to hire you back.
> They like a two-week notice, and so I suggested maybe if she wanted to get re-employed with Chili's maybe after she was done with school or in the summers or anything like that, that she either do a two-week notice or she had - - could maybe take a leave of absence.

---

[14] In their brief, Defendants' object that this testimony was elicited in response to a leading question to which counsel objected at the time it was asked (Dkt. No. 70, at 17).  While the Court notes the objection and agrees that the question asked by counsel is leading, the Court has discretion in overseeing witness interrogation, and it is not an abuse of discretion to permit a party to use leading questions during its cross-examination of its own witness who was called adversely by the opposing party.  *McCardle v. Mitchell Sch. Dist.*, Case No. CIV. 03-4092-KES, 2005 WL 1118154, at *2 (D. S.D. May 11, 2005) (citing *Alpha Display Paging, Inc. v. Motorola Communications & Elecs., Inc.,* 867 F.2d 1168, 1171 (8th Cir.1989)).  For purposes of this motion, the Court declines to strike Page's deposition testimony.

(Dkt. No. 60-3, at 66-67).   Downie also testified that she offered, with Brown's approval, to provide Page a schedule adjustment requested by Page's stepfather, Jeff Page (Dkt. No. 51-16, ¶ 4, at 5–7).  In a text message Jeff Page wrote to Downie, Jeff Page stated, "We appreciate all your efforts to help retain Emily.  She truly loves you all.  Just try to encourage her to the best of your abilities." (*Id.*).  In response, Downie wrote, "Of course! We care about Emily and appreciate her work ethic and passion she puts into her work.  Anything to help her succeed." (*Id.*).

Given the record evidence before the Court, viewed in the light most favorable to Page, no reasonable jury could conclude that Defendants constructively discharged Page.  *See Bell v. Baptist Health*, 60 F.4th 1198, 1203 (8th Cir. 2023) (determining that summary judgment on constructive discharge claims was appropriate where "Baptist Health tried to retain Bell by giving her paid administrative leave, offering to relocate her to a different location, and offering to transfer her to a new department.").

The Commission cites to the Middle District of Tennessee case of *EEOC v. Finish Line, Inc.* ("*Finish Line*"), as support for its argument that a reasonable jury could find that Page's working conditions were intolerable and her resignation was both foreseeable and "effectively compelled by Defendants' inaction." (Dkt. No. 59, at 27 (citing *Finish Line*, 915 F. Supp 2d, 904, 923–24 (M.D. Tenn. 2013)).  *Finish Line* is not binding precedent on this Court, but perhaps more important, the facts of this case are different from those in *Finish Line*.  *Finish Line* involved a 38 year old *general manager* who harassed three minor employees.  One employee, 16-year old Miranda Watson, was physically touched more than 30 times without her consent.  *Finish Line*, 915 F. Supp. 2d at 910–11.  When she confronted him about this and other inappropriate behavior, the supervisor retaliated against her by reducing her scheduled work hours.  *Id*.  The Court determined that there was sufficient evidence on the record to raise a genuine issue of material fact

on Watson's constructive discharge claim. *Id.*, at 923-24. As set forth above, this case, unlike *Finish Line*, does not involve a *supervisor* harassing a minor employee. Additionally here, there was no retaliation against Page by her supervisor after confronting her co-worker's harassment. Instead, Defendants responded to Page's allegations of harassment by her co-worker by initiating an investigation, which ended the alleged physical and verbal advancements of D.J. Thompson and ultimately led to his termination.

Finally, on the record before the Court, the Commission cannot establish that Page gave Defendants a reasonable opportunity to correct the allegedly intolerable working conditions. Page resigned on May 4, 2021, just 17 days after reporting harassment to Brown and one day before Defendants were able to obtain the information that they needed and requested from Page to complete their investigation and make their decision to terminate D.J. Thompson. Additionally, on the record before the Court, the day that Page resigned was the day that Page and her parents first complained to Defendants about issues related to her schedule and her schoolwork (Dkt. Nos. 60-3, at 66-67; 51-16, ¶ 4, at 5–7).

Thus, the Court determines based on the record evidence taken in the light most favorable to the Commission that no reasonable jury could conclude that Defendants deliberately created intolerable working conditions with the intention of forcing Page to quit. Accordingly, Defendants are entitled to summary judgment on Page's constructive discharge claim.

## IV.    Conclusion

For the reasons set forth in this Order, the Court grants the Defendants' motion for summary judgment (Dkt. No. 51). The Commission's complaint is dismissed with prejudice (Dkt. No. 1).

It is so ordered this 30th day of September, 2025.

_____
Kristine G. Baker
Chief United States District Judge